**IN THE UNTIED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| R.L. MORRISSEY & ASSOCIATES, INC. | ) | CASE NO._____ |
| | ) | |
| and | ) | JUDGE _____ |
| | ) | |
| AMERICAN RING MANUFACTURING, | ) | |
| INC. | ) | |
| | ) | |
| *Plaintiffs* | ) | |
| | ) | |
| v. | ) | |
| | ) | (Jury Trial Endorsed Hereon) |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| and | ) | |
| | ) | |
| UNITED STATES | ) | |
| INTERNAL REVENUE SERVICE, | ) | |
| | ) | |
| *Defendants.* | ) | |

## COMPLAINT

Now come Plaintiffs R.L. Morrissey & Associates, Inc. ("RL Morrissey") and American Ring Manufacturing, Inc. ("American Ring," with RLM and American Ring collectively called "Plaintiffs"), by and through undersigned counsel, and for its Complaint against Defendant United States of America ("United States") for a refund of amounts paid to the Internal Revenue Service ("IRS") plus interest thereupon according to law pursuant to 26 U.S.C. §7422(a), and against Defendant IRS for an order setting aside IRS Notice 2021-20, and an injunction against the IRS from enforcing the same pursuant to 5 U.S.C. §706(2), states as follows:

## PARTIES AND JURISDICTION

1.  Plaintiffs are each Ohio Corporations with their principal places of business in Solon, Ohio. American Ring is a wholly-owned subsidiary of RL Morrissey, and both companies are

treated as a single employer for Employee Retention Credit purposes under 26 U.S.C. § 3134(d) and 26 U.S.C. § 52(a) due to their parent-subsidiary relationship. Joinder of the Plaintiffs is proper under Fed. R. Civ. P. 20 as their claims arise from the same transaction or occurrence and involve common questions of operative fact.

2.   Defendant United States may be served with process by mailing a copy of the Summons and Complaint by certified mail to Rebecca C. Lutzko, United States Attorney for the Northern District of Ohio, 801 West Superior Avenue, Suite 400, Cleveland, OH 44113-1852, and by mailing a copy of the Summons and Complaint by certified mail to Pamela Bondi, Attorney General of the United States, 950 Pennsylvania Avenue, NW, Washington, DC 20530-0001.

3.   Defendant IRS is an agency within the Executive Branch of the U.S. Government under 5 U.S.C. § 701(b)(1), and may be served by mailing a copy of the Summons and Complaint by certified mail to 1111 Constitution Ave., N.W., Washington, D.C. 20224.

4.   Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331, 1340, and 1346(a)(1), and 5 U.S.C. §§ 702, 704 and 706.

5.   Venue is proper in this Court pursuant to 28 U.S.C. § 1402(a)(2).

## PAYROLL TAXES AND THE ERC

6.   Pursuant to the Federal Insurance Contributions Act, employers are required to withhold certain Federal income taxes and taxes from their employee's wages and other compensation ("FICA Taxes").

7.   Pursuant to 26 U.S.C. §§ 3102, 3111, 3301 and 3402, employers are also required to pay their own portion of FICA Taxes as well as taxes owed pursuant to the Federal Unemployment Tax Act ("FUTA Taxes"), with FICA Taxes and FUTA Taxes being commonly referred to, collectively, as "Payroll Taxes."

8.   Pursuant to 26 U.S.C. §§ 6302 and 6157, as well as 26 C.F.R. §§ 31.6302-1, 31.6302(c)-1, and 31.6302(c)-3, employers are required to periodically deposit Payroll Tax payments in certain prescribed Federal deposit banks.

9.   Pursuant to 26 U.S.C. §§ 6011, as well as 26 C.F.R. § 31.6071(a)-1, employers are further required to file quarterly Payroll Tax returns (known as "IRS Form 941") and annual returns for their FUTA Taxes.

10.   On or about March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (Pub. L. No. 116-36, "CARES Act"), which created a new refundable credit program commonly known as the Employee Retention Credit ("ERC"). Congress amended the ERC program several times by way of the Taxpayer Certainty and Disaster Relief Act of 2020 (Pub. L. 116-260), the American Rescue Plan Act of 2021 (Pub. L. 117-2), and the Infrastructure Investment and Jobs Act (Pub. L. 116-136).

11.   As amended, the ERC was available to businesses for all four (4) calendar quarters of 2020 (the "2020 ERC"), and (with limited exception, not applicable to this case) for the first three (3) calendar quarters of 2021 (the "2021 ERC").

12.   Businesses could qualify for the ERC in a given calendar quarter of 2020 and/or 2021 by showing either: (a) a decline in gross receipts over a given statutory threshold, compared to the corresponding quarter in 2019 (the "Gross Receipts Test"), or (b) a full or partial suspension of their business due to compliance with State, Local or Federal government-issued orders limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to COVID-19 (the "Government Order Test").

13.   For the Gross Receipts Test, the applicable qualifying drops in gross receipts were fifty percent (50%) for any calendar quarter in 2020 (compared to the corresponding calendar quarter of 2019), and twenty percent (20%) for any calendar quarter in 2021 (again, compared to the corresponding calendar quarter of 2019).

14.    As drafted by Congress, eligibility under the Government Order Test was fairly broad. A business would need only show it had a partial suspension that was "due to" orders from "an appropriate governmental agency." At worst, the term "due to" in a statute means "proximately caused by," which the United States Supreme Court has held includes causal connections except "situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity." *Paroline v. United States*, 572 U.S. 434, 445 (2014).

15.    Congress likewise chose to define the scope of applicable orders broadly, specifying only that they be from "an appropriate governmental agency."

16.    The Gross Receipts Test and Government Order Test were mutually exclusive, meaning a business would only need to pass one of the tests to qualify for the ERC. Thus, Congress expressly contemplated situations where a business had no reduction in gross receipts, or even perhaps experienced an increase in gross receipts (thus failing the Gross Receipts Test), but could nonetheless be eligible for the 2020 and 2021 ERC under the alternative Government Order Test.

17.    Regardless under which test the business qualified for the ERC, there were different rules imposed by Congress for "small" and "large" employers in terms of what types of wages could be treated as "qualifying wages," i.e. compensation eligible to be used to calculate the amount of the credits. The "small" versus "large" distinction was based on the average monthly full-time employees in 2019. For "small" employers (100 or fewer full-time employees for the 2020 ERC, and 500 or fewer full-time employees for the 2021 ERC), all wages could be counted as qualifying (up to the applicable caps discussed below). For "large" employers (more than 100 full-time employees for the 2020 ERC, and more than 500 full-time employees for the 2021 ERC) qualifying wages were limited to "non-service" wages, which the CARES Act expressly

defined as "wages paid by [an] eligible employer with respect to which an employee is not providing services[.]"

18.    For both the 2020 and 2021 ERC, subject to the aforementioned rules for "small" and "large" employers, qualifying wages consisted of W-2 wages, plus employer-paid healthcare expense. Certain amounts were statutorily required to be excluded from qualifying wages, including payroll costs used for forgiveness of a Paycheck Protection Program ("PPP") Loan, certain wage credits such as the Work Opportunity Tax Credit, and leave credits under the Families First Coronavirus Response Act.

19.    For the 2020 ERC, the amount of the credit was fifty percent (50%) of qualifying wages, with qualifying wages being capped at $10,000.00 annually per employee. Applying these rules, the maximum annual per-employee credit was $5,000.00 for the 2020 ERC. For the 2021 ERC, the amount of the credit was seventy percent (70%) of qualifying wages, with qualifying wages being capped at $10,000.00 quarterly per employee. Applying these rules, the maximum per-employee credit was $7,000.00 for each quarter in which the employer was eligible for the 2021 ERC.

### IRS ERC GUIDANCE AND NOTICE 2021-20

20.    Through The CARES Act, Congress authorized the Secretary of the Treasury to issue regulations and guidance as necessary for the IRS to facilitate the ERC. See, e.g., 26 U.S.C. § 3134(m). Nonetheless, no Treasury Regulations were ever promulgated with regard to the ERC, even to this day, nearly five (5) years after passage of the CARES Act.

21.    Instead of properly promulgated regulations, the initial "guidance" issued by the IRS was instead nothing more than a series of frequently-asked-questions ("FAQs") which were first published on the Treasury Department website, and later incorporated into a document known as IRS Notice 2021-20. In so doing, the IRS circumvented the notice-and-comment procedures required by the Administrative Procedure Act ("APA"), 5 U.S.C. § 553(b).

22.   In March of 2021, a full year after the passage of the CARES Act, the IRS issued Notice 2021-20. Per the IRS, Notice 2021-20 "incorporates the information provided in the FAQs and addresses additional issues [regarding the ERC]." See, Notice 2021-20 at p. 2. Like its other "guidance," the IRS drafted Notice 2021-20 in an FAQ format.

23.   Notice 2021-20 (and the FAQs it incorporated) made substantive changes to the law, including severely restricting eligibility for the ERC, in ways not contemplated by the CARES Act or subsequent ERC legislation, nor otherwise authorized by Congress:

(A)   Notice 2021-20 imposed an arbitrary "Ten Percent Test" requirement for the Government Order Test whereby a business could establish a partial suspension of its business by showing a reduction of at least ten percent of its gross receipts or hours worked. By unlawfully injecting a qualifying metric based on gross receipts into the Government Order Test, the "Ten Percent Test" directly conflicted with the CARES Act's two mutually exclusive qualifying tests, only one of which (the Gross Receipts Test) was conditioned on a decline in gross receipts. The "Ten Percent Test" is also completely arbitrary insofar as the IRS has no articulable basis for selecting a ten percent reduction in hours or gross receipts as the point in which a business was "partially suspended" by a government COVID order. See, Notice 2021-20 at pp. 26-27, Q/A 11.

(B)   Notice 2021-20 also set forth a very narrow definition of "non-service" wages for "large" employers, which was not only unnecessary insofar as the CARES Act had already provided a definition, but which directly contradicted Congress's broad definition, vastly limiting the intended scope. According to the IRS' position in Notice 2021-20, eligible "non-service" wages consist solely of furloughed wages, and do not include vacation, sick time and other forms of personal leave. Id. at pp. 58-59, 64, Q/A 34, 38.

(C)   Notice 2021-20 further limited ERC eligibility by disqualifying employers whose operations were interrupted by orders that may not have directly targeted the employer's business, but nonetheless proximately caused an interruption. Thus, according to Notice 2021-20, a government order that "causes a reduction in demand for [a business's] products or services" but does not directly target that business, cannot be relied upon to claim the 2020 or 2021 ERC. Id. at pp. 29-30, Q/A 13. This is directly contrary to the language of the CARES Act which requires only that a full or partial suspension of a business be "due to" a government order, as

opposed to being expressly mandated by such orders. 26 U.S.C. § 3134(c)(2)(A)(ii)(I).

(D)     Notice 2021-20 also precludes ERC eligibility to the extent a business "voluntarily" suspended operations due to government COVID Orders. Notice 2021-20 at p. 30, Q/A 14. Read in connection with Q/A 13, cited above, this means that even if COVID Orders virtually eliminate demand for some or all of the business's services, and the business determines that keeping some or all of its operations open is commercially impractical, according to the IRS, that business does not qualify for the ERC.

24.    Notice 2021-20 is a final "rule" issued by the IRS. Indeed, the IRS followed up Notice 2021-20 with several other "guidance" documents addressing changes in the ERC made by subsequent ERC legislation (e.g. extending the ERC into 2021), including Notices 2021-23, 2021-33, 2021-49 and 2021-65. Each of these subsequent Notices reference, relate to, and amplify Notice 2021-20.

25.    Notice 2021-20 ignores the plain language of the CARES Act and subsequently enacted ERC legislation, conflicts with the intent of Congress, limits the applicability of the statutorily created Government Order Test to the point where it is virtually meaningless, and morphs said test into nothing more than an alternate version of the Gross Receipts Test.

26.    The IRS has treated Notice 2021-20 as substantive law governing the entire ERC program. For example, in IRS Office of Chief Counsel Advice Memorandum AM 2023-007, which was issued on or about November 3, 2023 as the basis for the IRS' decision not to allow OSHA or CDC orders to qualify as "appropriate governmental orders" under the Government Orders Test, IRS Chief Counsel relies on Notices 2021-20, 2021-23, 2021-49 and 2021-65 as applicable law, alongside the CARES Act and subsequent ERC legislation.

27.    The IRS has relied on Notice 2021-20 to delay the processing of ERC claims, including those of Plaintiff, claiming that filings that do not comply with Notice 2021-20 are fraudulent or otherwise "high risk," and that additional review (and slower processing times) are needed to properly evaluate claims. See, IRS News Release IR-2024-169 (June 20, 2024), *available at*

https://www.irs.gov/newsroom/irs-enters-next-stage-of-employee-retention-credit-work-review-indicates-vast-majority-show-risk-of-being-improper. But for the IRS' insistence in applying Notice 2021-20, there would be no reason for the IRS to delay processing, and Plaintiff's ERC claims, filed more than one and one-half (1 1/2) years ago, would have been paid in full.

## PLAINTIFFS' ERC CLAIMS FOR Q1 2021 and Q2 2021

28.  RL Morrissey is a sales representative for fastener manufacturers. American Ring, its wholly-owned subsidiary, is a fastener manufacturer.

29.  During the COVID-19 pandemic, Plaintiffs were compelled to suspend and/or modify a more than nominal portion of their business due to compliance with State, Local or Federal government-issued orders limiting commerce, travel, or group meetings.[1] On the sales side, trade shows and other sales and marketing events relied upon to generate new business in the days prior to the pandemic were cancelled, and sales practices were modified to replace the pre-COVID model of conducting solicited and un-solicited in-person sales calls with less effective methods such as telephone/video conferences and email solicitations, due to social distancing mandates and capacity restrictions. On the manufacturing side, the same spacing and occupancy restrictions led to reduced efficiency and diminished output on their manufacturing lines, as did excessive absences due to forced quarantines and self-isolation of employees. As a result of these conditions, Plaintiffs experienced a significant decline in operating metrics during the pandemic, including gross receipts.

30.  As a result of the facts outlined above, Plaintiff qualified for the ERC under the Government Order Test for the first calendar quarter of 2021 ("Q1 2021") and the second calendar quarter of 2021 ("Q2 2021").[2]

---

[1] Under 26 U.S.C. § 3134(d), parent-subsidiary companies (as determined under 26 U.S.C. § 52(a)) are required to treat themselves as a single employer for ERC eligibility purposes. Accordingly, any full or partial suspension of RL Morrissey may be attributed to American Ring, and vice-versa.

[2] Plaintiffs experienced declines in 2020 as a result of compliance with government-issued Covid orders. However, Plaintiffs were considered a "large" employer for the 2020 ERC as they had more than 100 (but less than 500) average

31. On or about June 19, 2023, Plaintiffs filed Forms 941-X with the IRS for Q1 2021, and Q2 2021, with RL Morrissey claiming ERC refunds in the amounts of $580,544.60 and $484,419.32, respectively, and American Ring claiming ERC refunds in the amounts of $110,108.01 and $117,582.37, respectively (each an "ERC Refund Claim," and collectively, the "ERC Refund Claims").

32. As of the date of this filing, the IRS has failed to pay out any of the ERC Refund Claims.

33. Defendants have not issued any notices of audit, examination, disallowance, or deficiency for the time periods applicable to the ERC Refund Claims which would justify any further delays in issuing the requested refunds.

34. Defendants have made no claim upon the Plaintiff regarding any Federal taxes alleged to be owed by Plaintiff that could be properly offset by the refunds owed to Plaintiff pursuant to the ERC Refund Claims.

## FIRST CAUSE OF ACTION

### Refund of Payroll Taxes (26 U.S.C. § 7422(a))

35. Plaintiffs restate and reallege each of the preceding paragraphs as if fully rewritten herein.

36. A taxpayer is permitted to file a refund suit against the United States, pursuant to 26 U.S.C. § 7422 and 6532, for the recovery of taxes paid under Title 26 of the United States Code, provided that: (a) a claim for refund has been filed with the IRS; (b) it has been at least six (6) months from the date of such filing; and (c) it has been less than two (2) years from the date the IRS notified the taxpayer that such claim has been disallowed.

37. Plaintiffs filed for the ERC Refund Claims on or about June 19, 2023.

---

full-time employees per month in 2019. Because "large" employers are limited to using non-services wages, and because Plaintiffs claimed a PPP loan in 2020, a decision was made not to pursue the 2020 ERC as the amount of the resulting credits would be *de minimus*.

38.    Defendants have failed to issue any of the refunds for the ERC Refund Claims.

39.    It has been longer than six (6) months since Plaintiffs filed for the ERC Refund Claims.

40.    Defendants never disallowed any of the ERC Refund Claims, and the two (2) year statute of limitations based on a disallowance is thus inapplicable.

41.    Plaintiffs are entitled to the ERC Refund Claims, in the following amounts, plus interest in accordance with the law: RL Morrissey $580,544.60 and $484,419.32, respectively, and American Ring $110,108.01 and $117,582.37, respectively, for Q1 2021, and $1,077,977.77 for Q2 2021.

42.    Plaintiffs are entitled to reasonable attorney's fees and legal costs associated with this cause of action, pursuant to 28 U.S.C. § 2412.

## SECOND CAUSE OF ACTION

### Violation of the APA's Notice-and-Comment Rulemaking Requirement (5 U.S.C. § 553)

43.    Plaintiffs restate and reallege each of the preceding paragraphs as if fully rewritten herein.

44.    5 U.S.C. § 702 provides that a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of the relevant statute, is entitled to judicial review thereof."

45.    Agency actions taken without observance of procedure required by law can be set aside by the courts. 5 U.S.C. § 706(2)(D).

46.    Substantive rules made by an agency are required to go through the APA's notice and comment procedures. 5 U.S.C. § 553.

47.    Notice 2021-20 is a substantive rule under 5 U.S.C. § 553(b)(3)(A).

48.    The IRS failed to issue a notice of proposed rule-making with regard to Notice 2021-20.

49.    The IRS failed to provide a statement of the basis and purpose of the rules contained in Notice 2021-20.

50.   The IRS did not afford the public an opportunity to comment on the rules set forth in Notice 2021-20.

51.   Notice 2021-20 makes no showing of good cause which would eliminate the need for notice-and-comment rule-making.

52.   Notice 2021-20 subjected Plaintiffs to unreasonable and unexplained standards for ERC eligibility and credit calculations.

53.   Plaintiffs respectfully request the Court to set aside Notice 2021-20 as an invalid exercise of IRS authority.

54.   Plaintiffs also respectfully request the Court to impose a mandatory, nationwide injunction preventing the IRS from enforcing Notice 2021-20, or otherwise relying upon it when determining a taxpayer's eligibility for the ERC or the amount thereof.

55.   With regard to this Second Cause of Action, Plaintiffs do not seek to enjoin, impede, or restrain the collection of any tax. Plaintiffs do not seek any refund of taxes or credits for any clients through this Count, and instead limits its challenge to the IRS's failure to meet APA requirements under 5 U.S.C. § 553.

### THIRD CAUSE OF ACTION
### Arbitrary and Capricious Agency Action (5 U.S.C. § 706(2)(A))

56.   Plaintiffs restate and reallege each of the preceding paragraphs as if fully rewritten herein.

57.   Agency action is required by Federal Law to be reasonable and reasonably explained.

58.   Agency action is deemed arbitrary and capricious of it exhibits internally inconsistent reasoning.

59.   Notice 2021-20 is arbitrary and capricious because it:

    (A)    Eliminates the Government Orders Test in favor of a modified Gross Receipts Test through the imposition of the so-called "Ten Percent Test," with no explanation as to why gross receipts and

hours worked were the chosen metrics, nor why a ten percent decline was chosen as the threshold;

(B)    Imposes a draconian, unnecessary and nonsensical limitation on "non-service" wages for "large" employers, contradicting the definition already provided by Congress by allowing only furloughed pay and denying the use of vacation, time off and other forms of personal leave, which would be the first thing most people think of when talking about paid "non-service" time at work;

(C)    Denies ERC eligibility to employers who had Government Orders proximately cause an interruption to their operations or a reduction in demand for the business's services, where the language chosen by Congress merely uses the broad term "due to" when discussing the necessary causal relationship between the applicable orders and the suspension; and

(D)    Denies the ERC to employers who voluntarily suspended their business due to COVID orders that decreased demand for their services or otherwise made continuing operations not viable.

60.   Plaintiffs respectfully request that the Court enjoin the IRS from enforcing the Notice 2021-20, or otherwise relying upon it in determining a taxpayer's eligibility for the ERC or the amount thereof.

61.   With regard to this Third Cause of Action, Plaintiffs do not seek to enjoin, impede, or restrain the collection of any tax. Plaintiffs do not seek any refund of taxes or credits for any clients through this Count, and instead limits its challenge to the IRS's failure to meet APA requirements under 5 U.S.C. § 553.

### FOURTH CAUSE OF ACTION
### Unlawful Agency Action (5 U.S.C. § 706(2)(A) & (C))

62.   Plaintiffs restate and reallege each of the preceding paragraphs as if fully rewritten herein.

63.   The APA provides that a reviewing court "shall … hold unlawful and set aside agency action, findings and conclusions found to be … not in accordance with law [or] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]"

64.    Congress did not authorize the IRS to make substantive rules for the ERC, replace Congress's definition of "non-service" wages with its preferred (and much more limited) definition, eliminate or modify the Government Orders Test, or narrowly construe the causal relationship between COVID Orders and the resulting suspension of operations.

65.    The CARES Act, and subsequent ERC litigation, is clear and unambiguous. Congress did not authorize the IRS to issue substantive rules regarding the ERC, narrow the scope of eligibility for the same, or fundamentally alter the statutory scheme for both eligibility and calculating the credits.

66.    Because Notice 2021-20 adopts substantive positions inconsistent with Congressional command, the IRS has acted beyond its authority in issuing and enforcing the same.

67.    Plaintiffs respectfully request that the Court enjoin the IRS from enforcing Notice 2021-20, or otherwise relying upon it in determining a taxpayer's eligibility for the ERC or the amount thereof.

68.    With regard to this Fourth Cause of Action, Plaintiffs do not seek to enjoin, impede, or restrain the collection of any tax. Plaintiffs do not seek any refund of taxes or credits for any clients through this Count, and instead limits its challenge to the IRS's failure to meet APA requirements under 5 U.S.C. § 553.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for the following relief:

I.       As to Count One, against Defendant United States, pursuant to 26 U.S.C. § 7422(a):

(A)    An Order from this Court ordering Defendant to pay Plaintiff RL Morrissey the sum of $580,544.60 and ordering Defendant to pay Plaintiff American Ring $110,108.01 for their respective Q1 2021 ERC Refund Claims, with interest thereupon; and

(B) An Order from this Court ordering Defendant to pay Plaintiff RL Morrissey the sum of $484,419.32 and ordering Defendant to pay Plaintiff American Ring $117,582.37 for their respective Q2 2021 ERC Refund Claims, with interest thereupon; and

(C) Any further monetary or equitable relief this Court deems fair and just.

II. As to Counts Two, Three and Four, against Defendant IRS:

(A) Enjoin the IRS from enforcing Notice 2021-20;

(B) Vacate Notice 2021-20 pursuant to 5 U.S.C. § 706(2); and

(C) Any further monetary or equitable relief this Court deems fair and just.

Respectfully submitted,

CORSARO & ASSOCIATES CO., LPA

By: _____/s/ Christian M. Bates_____
Christian M. Bates, Esq. (#0079761)
Joseph G. Corsaro, Esq. (#0011474)
Steven B. Beranek, Esq. (#0066847)
28039 Clemens Rd.
Westlake, OH   44145
Ph: (440) 871-4022
Fax: (440) 871-9567
cbates@corsarolaw.com
jgcorsaro@corsarolaw.com
sberanek@corsarolaw.com
*Attorneys for Plaintiffs*

## **JURY DEMAND**

Plaintiffs request a jury trial for all issues triable by a jury pursuant to Federal Rule of Civil Procedure 38(b).

By: _____/s/ Christian M. Bates_____
Christian M. Bates, Esq.
*Attorney for Plaintiffs*